# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| GARY GENE HUDSON, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 5:12-44 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| Acting Commissioner of | § | |
| Social Security,[1] | § | |
| | § | |
| *Defendant.* | § | |

## REPORT AND RECOMMENDATION

Plaintiff Gary Gene Hudson ("Hudson") requests judicial review of an adverse decision on his applications for benefits under the Social Security Act.

A reviewing court's limited role is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, ___U.S.___, 130 S. Ct. 1503 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). Reviewing courts cannot retry factual issues *de novo* or substitute their interpretations of administrative records for that of the Commissioner when the record contains substantial support for the decision. *Yancey v. Apfel*, 145 F.3d

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she therefore should be substituted for Michael J. Astrue as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C § 405(g).

106, 111 (2d Cir. 1998). Neither can reviewing courts overturn the Commissioner's administrative rulings because they would have reached a different conclusion had the matter come before them in the first instance. *See Campbell v. Astrue*, 465 Fed. App'x 4, 5 (2d Cir. 2012).

## I. Procedural Background

Hudson applied for disability insurance ("DIB") and supplemental security income ("SSI") benefits claiming disability due to: *back and neck injuries* and *depression.* (T. 21, 144-46, 147-50, 164, 169).[2] Following an evidentiary hearing at which Hudson was represented by legal counsel, an administrative law judge, David Shaw ("ALJ Shaw"), denied Hudson's applications. (T. 21-30). After unsuccessfully requesting Appeals Council review, Hudson timely instituted this proceeding. (Dkt. No. 1).

## II. Commissioner's Decision

ALJ Shaw utilized a five-step sequential evaluation procedure prescribed by regulation and approved by courts as a fair and just way for determining disability applications in conformity with the Social Security Act. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler*, 461 U.S. at 461). In a 10-page, singled-spaced decision, he found that Hudson has "severe" impairments[3] consisting of *depressive disorder, anxiety disorder*,

---

[2]    "T." followed by a number refers to the page of the administrative record. (Dkt. No. 10).

[3]    "Severe" is a term of art. Under governing circuit law, "[a] 'severe' impairment is one that significantly limits an individual's physical or mental ability to do 'basic work activities.'" *Meadors v. Astrue*, 370 Fed. App'x 179, 182 (2d Cir. 2010)(citing 20 C.F.R. §§ 404.1520(c), 416.920(c)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). "A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' . . . [with] . . . 'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting *Bowen*, 482 U.S. at 154 n. 12).

*arthritis*, *headaches*, *back disorder*, and *post-traumatic stress disorder*. (T. 21-30). He also found that these impairments diminish Hudson's "residual functional capacity"[4] such that he can now perform work-related activities only at the "light" exertional level[5] with several additional limitations: (1) lifting or carrying no more than 10 pounds occasionally; (2) low stress work at less than production line pace with only limited decision-making and limited contact with the public and supervisors; (3) ability to look up, down or left as needed; (4) avoidance of hazardous conditions; (5) avoidance of temperature extremes; and (6) requirement of an option to sit or stand at will. (T. 25). ALJ Shaw found that these limitations prevent Hudson from performing his past relevant work, but that Hudson can still perform requirements of several sedentary, unskilled occupations that exist in significant numbers in the national economy. (T. 28-29). He further found that Hudson can make a successful adjustment to such other jobs. *Id*. Therefore, he concluded that Hudson is "not disabled." (T. 29).

When calculating Hudson's residual functional capacity, ALJ Shaw substantially rejected Hudson's subjective statements concerning intensity, persistence, and limiting effects of his symptoms.[6] (T. 26). He also assigned little weight to a physical residual functional capacity assessment by treating

---

[4]       *See* definition and discussion of residual functional capacity, *infra*, at Section IV.*B*.2.

[5]       "Light work" involves lifting no more than twenty pounds at a time with frequent lifting and carrying of objects weighing up to ten pounds. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b); SSR 83-10, TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK–THE MEDICAL-VOCATIONAL RULES OF APPENDIX 2, 1983 WL 31251, at **5-6 (SSA 1983).

[6]       *See* discussion of Hudson's testimony in Section VI.*B*., *infra*.

doctor Stephen C. Robinson, M.D.,[7] and to a mental residual functional capacity assessment of Hudson's treating social worker, Brenda Larkin, LCSW,[8] who opined that Hudson has marked and extreme limitations in his ability to perform work-related mental activities.  ALJ concluded that both of these treating sources were overly pessimistic with regard to Hudson's ability to function on a full time and sustained basis.  (T. 28).

Giving reasons, ALJ Shaw stated with respect to Dr. Robinson:

Dr. Robinson's medical source statements were not wholly consistent with one another and purported to limit the claimant more than required per the medical records.  Additionally, the evidence showed that the claimant's symptoms were exaggerated according to the consultative examiner, and the claimant presented a great deal of improvement over time.

(T. 27-28).  And, regarding Ms. Larkin, ALJ Shaw explained:

Ms. Larkin indicated that the claimant had extreme limitations in social interaction but she also reported strong familial relationships, and further that the claimant spent most of his time with his friends.  Hence, the finding of an extreme limitations in this area is unsubstantiated.

---

[7]    Dr. Robinson completed two medical source statements reflecting his diagnoses that Hudson suffers from pain in his lumbar spine, neck, arms, and legs.  In his May 14, 2010 statement, he opined that these impairments allow Hudson to lift and carry only up to 10 pounds occasionally and to sit, stand or walk only 1 hour in an 8 hour workday.  Dr. Robinson opined that Hudson cannot use his feet for activities, and can never climb ladders, balance, stoop, kneel, crouch or crawl.  Dr. Robinson opined that Hudson can walk a block at a reasonable pace, use public transportation, travel without a companion, climb a few steps at a reasonable pace and sort, handle and use paper/files.  In his November 22, 2010 statement, Dr. Robinson opined that Hudson cannot walk a block at a reasonable pace on rough or uneven surfaces and can never push or pull with his hands.  He stated, however, that Hudson can sit, stand and walk 2 hours in an 8 hour workday.  (T. 27, 416-22, 430-38).

[8]    On November 26, 2010, Ms. Larkin completed a mental medical source statement.  She opined that Hudson had marked limitations in the following areas: understanding and remembering complex instructions, carrying out complex instructions and the ability to make judgments on complex work-related decisions.  Ms. Larkin also indicated that Hudson has extreme limitations in his ability to deal with the public, interact with supervisors and coworkers and respond appropriately to usual work situations and to change in a routine setting. (T. 27, 426-29).

Moreover, Ms. Larkin is a licensed social worker and is therefore not an "acceptable medical source" as defined within the meaning of the Regulations. Furthermore, under the Regulations such reports and opinions are considered "other" evidence of less probative value than information from "acceptable source," *i.e.*, licensed physicians (20 CFR 404.1513). . . . Considering the record in its entirety, the undersigned finds that Ms. Larkin's opinion is not adequately supported by objective clinical findings and other evidence, and therefore, accords her opinion little weight.

(T. 28) (internal citations omitted).

ALJ Shaw placed significant weight, instead, on opinions of two consultative examiners, Dr. Roberto Rivera, M.D. (physical consultative examination[9]) and Dr. Kristen Barry, Ph.D. (psychiatric consultative examination[10]) finding that their assessments were consistent with the examinations and the record. (T. 27-28). He further gave significant weight to

---

[9] On January 20, 2010, Dr. Rivera conducted a physical consultative examination of Hudson. (T. 364-69). In a medical source statement, Dr. Rivera opined that Hudson had a form of psychiatric disorder that caused an exaggeration of his limitations that he presented during the examination. *Id.* In this regard, Dr. Rivera opined that "most of the limitations to range in motion are voluntary on his part and are not secondary to severe trauma of the motor vehicle accident." (T. 368). According to Dr. Rivera, Hudson had no limitations to sitting, standing, walking, lifting, carrying, pushing or pulling. *Id.* He diagnosed Hudson with diffuse total body pain and limitations to range of motion secondary to a motor vehicle accident, status post right inguinal hernia repair by history and left sided chest pain by history. *Id.*

[10] On January 10, 2010, Dr. Barry conducted a psychiatric examination of Hudson. (T. 370-75). In a medical source statement, Dr. Barry opined that Hudson could follow and understand simple directions and instructions and he should be able to perform simple tasks independently. She further noted that Hudson demonstrated the ability to maintain his attention and concentration but had difficulty handling stressors and making appropriate decisions. Dr. Barry diagnosed Hudson with alcohol and cannabis dependence, depressive disorder, and anxiety. *Id.*

an opinion of a State agency medical consultant, Dr. V. Reddy, noting that it was consistent with the evidence contained in the record.[11] *Id.*

As a basis for finding that Hudson can still perform alternative work , ALJ Shaw relied on evidence from an impartial vocational expert, Dr. Dixon Pearsall, Ph.D., CRC, NCC ("VE Pearsall"). (T. 29, 52-59). VE Pearsall testified that an individual of Hudson's age, education, and work experience, and with the limited residual functional capacity formulated by ALJ Shaw, can perform all requirements of sedentary and unskilled occupations such as: weight tester, surveillance systems monitor and quotation clerk. *Id.* He also testified that these jobs exist in significant numbers in the national economy. *Id.*

## III.  Points of Error

Hudson articulates a single point of error:

> *Is the Plaintiff entitled to disability or disability insurance benefits under Sections 216(i) and 223(d) respectively of the Social Security Act?*

(Dkt. No. 13, p. 7).  Read literally, this does not present a justiciable issue because, as stated at the outset, reviewing courts cannot make *de novo* determinations of disability.  Construing Hudson's arguments liberally,[12] however, and restating them in logical analytical order, Hudson arguably advances four discrete points capable of judicial review:

    1.    ALJ Shaw erred in not giving proper weight to the physical and mental assessments of his treating sources (Dr.  Robinson, Ms. Larkin);

---

[11]    On February 11, 2010, State agency medical consultant, Dr. V. Reddy, completed a mental residual functional capacity assessment, which essentially adopted the assessment of Dr. Barry and found that Hudson could perform the basic functional requirements of unskilled work.  (T. 411-15).

[12]    "Liberally" may be an  understatement.  Hudson's brief includes only three pages of argument devoid of citations to the administrative record or controlling legal precedent.

2. ALJ Shaw erred in rejecting Hudson's subjective testimony as lacking credibility;

3. ALJ Shaw's residual functional capacity finding is not supported by substantial evidence; and

4. VE Pearsall's testimony does not constitute substantial evidence of Hudson's ability to perform alternative work because ALJ Shaw's hypothetical question did not include Hudson's psychological limitations.

In response, the Commissioner maintains that ALJ Shaw thoroughly evaluated the evidence regarding Hudson's alleged physical and mental impairments, and that his residual functional capacity finding is supported by substantial evidence. (Dkt. No. 18, pp. 10-19). The Commissioner contends that ALJ Shaw properly evaluated the opinions and assessment of Hudson's treating sources under the regulations and rulings and provided appropriate reasons for the amount of weight accorded to them. *Id.* The Commissioner maintains that ALJ Shaw correctly found that Hudson could do other work. (Dkt. No. 18, p. 20-22). As such, the Commissioner contends that ALJ Shaw's decision is supported by substantial evidence and should be affirmed.

## IV. Preliminary Discussion

This section delineates legal principles governing the Social Security programs at issue and the administrative decision-making process (including certain terms of art).

A. *DIB and SSI Programs; Eligibility for Benefits*

*Disability Insurance* benefits, authorized by Title II of the Social Security Act and funded by social security taxes, provide income to insured individuals forced into involuntary, premature retirement by reason of disability. *Supplemental Security Income* benefits, authorized by Title XVI of the Social

Security Act and funded by general tax revenues, provide an additional resource to assure that disabled individuals' income does not fall below the poverty line. Applicants seeking benefits under either of these statutory provisions must prove "disability" within the meaning of the Social Security Act, which defines disability in virtually identical language for both programs, *viz., "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."* *See* 42 U.S.C. §§ 423(d)(1)(A)*, * 1382c(a)(3).

This standard is so rigorous that one federal court of appeals has described it as bordering on the unrealistic.[13] Thus, a person who might well be considered disabled in the ordinary sense of the word, may not be disabled within the specialized meaning of the Social Security Act.

B.    *Sequential Evaluation Procedure*

The Commissioner utilizes a five-step, sequential evaluation procedure for adjudicating disability-based claims. *See* 20 C.F.R. §§ 404.1520(a), 416.920. This model is "sequential" in that when a decision can be made at an early step, remaining steps are not considered. *See* 20 C.F.R. §§ 404.1520, 416.920.

*Claimants* must present evidence sufficient to produce favorable findings under the first four steps. *DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998). When they successfully carry this burden, a *prima facie* case of disability is established. *See Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984). The burden then shifts to the *Commissioner* to show in Step 5 that "there is work in the national economy that the claimant can do." *Poupore v. Astrue*,

---

[13]    *See Oldham v. Schweiker,* 660 F.2d 1078, 1083 (5th Cir. 1981).

566 F.3d 303, 306 (2d Cir. 2009); *see also DeChirico*, 134 F.3d at 1180; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); 20 C.F.R. §§ 404.1566, 416.966. Generally at Step 5, an ALJ elicits or consults expert vocational testimony or officially-published data to determine when a claimant's residual work skills can be used in other work and specific occupations in which they can be used.[14]

Specialized rules – some imposed externally by courts – govern the Commissioner's applications of these five steps. Those particularly pertinent to Hudson's restated points of error are described below.

1. <u>Credibility Assessments</u>

In almost every instance, an administrative law judge must make a credibility assessment, that is, decide how much weight to give to a particular item of evidence.

a. *Treating Source Opinions*

The so-called "treating physician rule" requires ALJs to give controlling weight to opinions of claimants' treating physicians regarding the nature and severity of impairments, provided they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Sanders v. Commissioner of Soc. Sec.*, No. 11-2630-cv, 2012 WL 6684569, at *2 (2d Cir. Dec. 26, 2012); *Halloran v. Barnhart*, 362 F.3d 28, 31–32 (2d Cir. 2004); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

---

[14]     *See* 20 C.F.R. §§ 404.1566(d) and 416.966(d) (Commissioner will take administrative notice of "reliable job information" available from various publications, including the DOT); *see also* 20 C.F.R. §§ 404.1566(e) and 416.966(e) (Commissioner uses vocational experts as sources of occupational evidence in certain cases).

When *controlling weight* is *not* given a treating physician's opinion, an ALJ must consider the following regulatory factors in determining *how much weight*, if any, to give such an opinion: (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Halloran*, 362 F.3d at 32; *Shaw*, 221 F.3d at 134. Treating physician opinion may be rejected based upon proper consideration of any of these factors.

Thus, when treating source opinion swims upstream, contradicting other substantial evidence, such as opinions of other medical experts, it may not be entitled to controlling weight. *See Williams v. Commissioner of Soc. Sec.*, 236 Fed. App'x 641, 643-44 (2d Cir. 2007); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). A treating physician's opinion also may be discounted when it is internally inconsistent. *See Micheli v. Astrue*, No. 11–4756–cv, 2012 WL 5259138, at *2 (2d Cir. Oct. 25, 2012). Similarly, treating source opinion that lacks underlying expertise,[15] or that is brief, conclusory and unsupported by

---

[15] *See Terminello v. Astrue*, No. 05-CV-9491, 2009 WL 2365235, at *6-7 (S.D.N.Y. July 31, 2009) (affirming ALJ's refusal to give controlling weight to treating physician's opinion that claimant had "no useful ability to work" because of "stress and depression" where treating physician was not a psychiatrist and claimant had "not seen a psychiatrist for depression"); *Armstrong v. Commissioner of Soc. Sec.*, No. 05-CV-1285 (GLS/DRH), 2008 WL 2224943, at *11, 13 (N.D.N.Y. May 27, 2008) (affirming ALJ's refusal to give controlling weight to treating physician's opinion that claimant "had anxiety/depression" where treating physician was not a psychiatrist and had "never treated [claimant] for any of the symptoms" reported to be due to anxiety or depression).

clinical findings,[16] or appears overly sympathetic such that objective impartiality is doubtful and goal-oriented advocacy is reasonably suspected, can be rejected.[17]

### b.  Other Medical Sources

The Commissioner also will consider evidence from "other sources" to show "severity of [the claimant's] impairment(s) and how it affects [the claimant's] ability to work."  *See* 20 C.F.R. §§ 404.1513(e), 416.913(e).  An interpretive Ruling states that opinions from "other sources" are "important and should be evaluated on key issues such as impairment severity and functional effects." SSR 06–03p, Titles II and XVI: Considering Opinions and Other Evidence From Sources Who Are Not "Acceptable Medical Sources" in Disability Claims, 2006 WL 2329939, at *3 (SSA Aug. 9, 2006).  Specifically, that Ruling provides:

> In addition to evidence from "acceptable medical sources," we may use evidence from "other sources," . . . to show the severity of . . .

---

[16]    *See Perez v. Barnhart*, 415 F.3d 457, 466 (5th Cir. 2005) (finding "good cause" exceptions for giving less or no weight to treating physicians' opinions exceptions, such as "statements that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence"); *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) ("ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by the clinical findings"); *Alvarado v. Barnhart*, 432 F. Supp. 2d 312, 321 (W.D.N.Y. 2006) (treating physician's opinion "must be discounted" where it is "too brief and conclusory [and] wholly unsupported by any medical evidence, treatment notes, specific findings, or clinical or diagnostic techniques").

[17]    *See Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) ("[M]any physicians (including those most likely to attract patients who are thinking of seeking disability benefits,...) will often bend over backwards to assist a patient in obtaining benefits.") (parenthesis in original); *see also Labonne v. Astrue*, 341 Fed. App'x 220, 225 (7th Cir. 2009) ("[A]n ALJ may reject a treating physician's opinion over doubts about the physician's impartiality, particularly since treating physicians can be overly sympathetic to their patients' disability claims."); *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985) (citing *Whitney v. Schweiker*, 695 F.2d 784, 789 (7th Cir. 1982)) ("The ALJ may also reject a treating physician's opinion if he finds, with support in the record, that the physician is not credible and is 'leaning over backwards to support the application for disability benefits.'").

impairment(s) and how it affects the individual's ability to function. These sources include, but are not limited to:

- . . . licensed clinical social workers . . . ;

. . .

Information from these "other sources" cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an "acceptable medical source" for this purpose. However, information from such "other sources" may be based on special knowledge of the individual and may provide *insight into the severity of the impairment(s) and how it affects the individual's ability to function.*

SSR 06–03p, 2006 WL 2329939, at *2 (emphasis added).

"Other source" treating opinions never enjoy a controlling weight presumption. *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 n. 2 (2d Cir. 1983) ("diagnosis of a nurse practitioner should not be given the extra weight accorded a treating physician."). But, when weighing opinions of "other sources," an administrative law judge looks to the same factors enumerated in the above Regulation pertaining to evaluating "acceptable medical source" treating opinions (when they are not afforded controlling weight).[18] *See Canales v. Commissioner of Soc. Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010) (citing 20 C.F.R. § 404.1527(d) and SSR 06-03p, 2006 WL 2329939, at *4).

c. *Subjective Testimony*

Pain is an important element in disability claims, and pain evidence must be thoroughly considered. *See Ber v. Celebrezze*, 332 F.2d 293, 298-99 (2d Cir. 1964). The best-informed (sometimes *only*) source of information regarding intensity, persistence and limiting effects of pain and other potentially disabling

---

[18]     "Acceptable medical sources" are set forth in the Regulation as (1) Licensed physicians (medical or osteopathic doctors); (2) Licensed or certified psychologists; (3) Licensed optometrists; (4) Licensed podiatrists; and (5) Qualified speech-language pathologists. 20 C.F.R. §§ 404.1513(a), 416.913(a).

symptoms is the person who suffers therefrom. Testimony from claimants, therefore, is not only relevant, but desirable.

On the other hand, such testimony is subjective and may be colored by the claimant's interest in obtaining a favorable outcome. Hence, subjective symptomatology by itself cannot be the basis for a finding of disability. A claimant must present medical evidence or findings that the existence of an underlying condition could reasonably be expected to produce the symptoms alleged. *See* 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, POLICY INTERPRETATION RULING TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at *2 (SSA July 2, 1996); SSR 96-4p, TITLES II AND XVI: SYMPTOMS, MEDICALLY DETERMINABLE PHYSICAL AND MENTAL IMPAIRMENTS, AND EXERTIONAL AND NONEXERTIONAL LIMITATIONS, 61 Fed. Reg. 34488-01, 34489, 1996 WL 362210 (SSA July 2, 1996).

An ALJ must decide how much weight to give claimants' subjective self-evaluations. Fortunately, the Commissioner again provides explicit guidance in this area. First, a formally- promulgated regulation requires—once an impairment is identified—consideration of seven specific, *objective* factors that naturally support or impugn *subjective* testimony of disabling pain and other symptoms.[19]

---

[19]     An ALJ must evaluate a claimant's symptoms, including pain, based on the medical evidence and other evidence, including he following factors:

    (i)     claimant's daily activities;
    (ii)    location, duration frequency, and intensity of claimant's pain or other symptoms;
    (iii)   precipitating and aggravating factors;
    (iv)    type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate her pain or other symptoms;

                                                    (continued...)

Second, SSR 96–7p directs ALJs to follow a two-step process to evaluate claimants' allegations of pain:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment (s) . . . that could reasonably be expected to produce the individual's pain or other symptoms . . . .

> Second, . . . the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities . . . .

SSR 96-7, 1996 WL 374186, at *2. The Ruling further provides that "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." *Id.*

Governing circuit law generally mirrors the Commissioner's Ruling. Thus, when an ALJ rejects a claimant's testimony of pain and limitations, he or she must provide explicit reasons for rejecting the testimony. *See Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988); *Carroll v. Secretary of Health & Human Servs.,* 705 F.2d 638, 643 (2d Cir. 1983).

---

[19](...continued)
```
(v)    treatment, other than medication, claimant receives or has
       received for relief of her pain or other symptoms;
(vi)   measures claimant uses or has used to relieve pain or other
       symptoms; and
(vii)  other factors concerning claimant's functional limitations and
       restrictions due to pain or other symptoms.
```

*See* 20 C.F.R. §§ 404.1529 (c),416.929(c).

2. <u>Residual Functional Capacity</u>

Before making findings at Steps 4 and 5 of the sequential evaluation process, an ALJ must first assess and articulate a claimant's "residual functional capacity" ("RFC"). This term refers to what claimants can still do in a work setting despite their physical and/or mental limitations caused by their impairments and any related symptoms, such as pain. *See* 20 C.F.R. §§ 404.1545, 416.945(a); *see also Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (defining RFC). Administrative law judges thus decide whether applicants, notwithstanding their impairments, have physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis. *See* SSR 96-8p, TITLE II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 61 Fed. Reg. 34474, 1996 WL 374184, at *4 (SSA July 2, 1996).

Commendably, the Commissioner provides detailed guidance for claims adjudicators in the form of both a formal regulation and an internal policy ruling. Collectively, these directives (a) identify various ordinary physical functions to be considered in context of an ordinary work schedule, (b) require function-by-function assessments of those activities, and (c) dictate that ultimate RFC determinations account for limitations imposed by both severe and non-severe impairments. *See* 20 C.F.R. §§ 404.1545(a)(2), 404.1545(b), 416.945(a)(2), 416.945(b); SSR 96-8p, 1996 WL 374184, at **5, 7.

## V. Judicial Review

The Commissioner's findings are conclusive, and they must be affirmed when proper principles of law were applied, and when the Commissioner's

decision is supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also* 42 U.S.C. § 405(g); *Halloran*, 362 F.3d at 31.

1.  <u>Substantial Evidence</u>

"Substantial evidence" is a term of art. It means less than a "preponderance" (usual standard in civil cases), but "more than a mere scintilla," or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson*, 402 U.S. at 401; *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009); *Halloran*, 362 F.3d at 31. Stated another way, to be "substantial," evidence need only be "enough to justify, if the trial were submitted to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *National Labor Relations Bd. v. Columbian Enameling & Stamping Co.*, 306 U.S. 262, 299-300 (1939), *cited in* Harvey L. McCormick, Social Security Claims and Procedures § 672 (4th ed. 1991).

When conducting a substantial evidence review, a court's responsibility is "'to conduct a searching inquiry and to scrutinize the entire record, having in mind that the Social Security Act . . . is remedial in purpose.'" *Monette v. Astrue*, 269 Fed App'x 109, 110 (2d Cir. 2008) (quoting *McBrayer v. Secretary of Health & Human Servs.*, 712 F.2d 795, 798-99 (2d Cir. 1983)). In this circuit, courts consider both objective and subjective factors: (1) objective medical facts; (2) diagnoses and opinions from treating and examining physicians; (3) subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) claimant's age, educational background, and work history. *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983).

2.    Reviewing Credibility Choices

Administrative law judges (who usually have the only opportunity to observe witnesses' demeanor, candor, fairness, intelligence and manner of testifying) obviously are best-positioned to make accurate credibility determinations.  *See Campbell*, 465 Fed. App'x at 7 (function of Commissioner, not the court, to appraise credibility); *see also Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999) (stating that deference is given to ALJ's decision because he is in the best position to assess the claimant's credibility).  Consequently, reviewing courts are loathe to second-guess and overturn credibility choices made by an administrative adjudicator.  *See Pietrunti v. Director, Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) ("Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.'"); *Aponte v. Secretary, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) ("It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."); *see also Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) ("Normally, [the court] give[s] an ALJ's credibility determinations special deference because the ALJ is in the best position to see and hear the witness.").

Reviewing courts, however, cannot abdicate their statutory duty to determine whether correct principles of law were applied and whether challenged decisions are supported by substantial evidence.  Consequently, even credibility choices are examined in that limited context.[20]

---

[20]      When an ALJ neglects to employ the proper legal standard, the court cannot subject his credibility determination to meaningful review.  *See Meadors v. Astrue*, 370 Fed. App'x 179, 184-85 (2d Cir. 2010) (Because ALJ eschewed the two-step credibility inquiry required under 20 C.F.R. § 404.1529(c), remand required for a redetermination of claimant's RFC under the correct standard).

# VI.  Application Analysis

Analytically, the primary challenge to ALJ Shaw's decision relates to his credibility choices with respect to both treating source opinions and Hudson's subjective testimony.  These points, therefore, are addressed first.

## A.  *Weight Afforded Treating Source Opinions*

Hudson argues that ALJ Shaw violated the treating physician rule when he afforded "little weight" to the physical medical source statements of Dr. Robinson and the mental medical source statement of Ms. Larkin.  (Dkt. No. 13, pp. 9-10).

### 1.  <u>Physical Capacity Assessments</u>

ALJ Shaw first cited all applicable Regulations and Rulings identified earlier in Section IV.*B*.1.  (T. 22, 25).  This indicates his awareness of and intent to follow proper legal principles.  ALJ Shaw fully explained his basis for giving little weight to the opinions of Dr. Robinson.[21]  (T. 27-28).  Specifically, ALJ Shaw assigned them little weight because they were internally inconsistent and were not consistent with the record as a whole.   (T. 27-28).

Consistency with the record as a whole is one of the six factors  relevant to how much weight to afford treating source opinion.  *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Internal inconsistency clearly qualifies as an "other significant factor" under that Regulation. *See Micheli*, 2012 WL 5259138, at *2.  Accordingly, there is no inherent structural or legal error in the manner ALJ Shaw went about weighing and then discounting Dr. Robinson's opinion.

---

[21]     For a synopsis of Dr. Robinson's opinions, *see* footnote 7, *supra*.

ALJ Shaw's consideration of these factors was not patently unreasonable under the evidence. First, Dr. Robinson's opinions were internally inconsistent on important issues.[22] Second, Dr. Robinson's opinions conflict with the overall medical evidence. Other diagnostic and examining sources recorded normal and nearly normal physical findings. On May 19, 2009, a magnetic resonance image ("MRI") of Hudson's thoracic spine revealed only mild disc bulges at T6-7. No cord compression was identified. (T. 328). The studies did not show evidence of any disc herniation or vertebral fracture. (T. 327-28). Similarly, an August 31, 2009, MRI of Hudson's cervical spine was normal. (T. 230). Although it was noted that there may be some early degeneration at the C4-5 disc, there was no evidence of herniation or stenosis. *Id.* A May 19, 2009, MRI of Hudson's lumbar spine did reveal L4-5 paracentral disc protrusion and broad disc bulges at L5-S1, but, again, there was no notation of herniation, vertebral fracture or significant narrowing of the canal. (T. 327).

Examining physician Dr. Rivera observed that Hudson's gait was normal; his stance at rest was normal; and he used no assistive devices. (T 366-68). Hudson needed no help changing clothes for the examination or getting on and off the examination table. *Id.* Hudson was able to rise from a chair slowly and deliberately. *Id.* Hudson's skin, lymph nodes, head, face, eyes, ears, nose, throat, and neck were normal. *Id.* His lungs were clear to auscultation. *Id.*, at 367. Percussion was normal. *Id.* Diaphragmatic motion was normal. *Id.* Hudson's heart had a regular rhythm with no murmur, rub, or audible gallop.

---

[22]     In Dr. Robinson's May 2010 medical source statement, he opined that Hudson could lift and carry up to 10 pounds occasionally and could sit, stand, or walk only 1 hour in an 8 hour workday. (T. 27, 416-22). He also stated that Hudson could walk a block at a reasonable pace and could sort, handle and use paper/files. (T. 416-22). But, in November 2010, Dr. Robinson opined that Hudson could not walk a block at a reasonable pace. (T. 430-36). He also changed his opinion and indicated that Hudson could sit, stand, and walk 2 hours in an 8 hour workday. (T. 27, 430-36).

*Id.* His abdomen exhibited no recurrence of a right inguinal hernia, and was soft and nontender with normal bowel sounds. *Id.*

Dr. Rivera reported that Hudson's cervical spine showed full flexion and extension. (T. 367-68). There was no scoliosis, kyphosis, or abnormality of the thoracic spine. *Id.* Lateral flexion was full bilaterally. *Id.* Lumbosacral rotation was full. *Id.* Hudson had full range of motion in his shoulders, elbows, forearms, and wrists bilaterally. *Id.* Although Hudson's hips exhibited flexion and extension of 60 to 70 degrees, other hip motions were full.[23] *Id.* He had full range of motion of his ankles bilaterally. *Id.* Strength was only slightly reduced to 4/5 out of 5/5 in his upper and lower extremities bilaterally. *Id.* There was no evident subluxations, contractures, ankylosis, or thickening. *Id.* His joints were stable and nontender. *Id.* There was no redness, heat, swelling, or effusion. *Id.* No trigger points were evident. *Id.* Dr. Rivera noted that Hudson's deep tendon reflexes were physiologic and equal in his upper and lower extremities. *Id.* No motor or sensory deficits were noted. *Id.*

Finally, Hudson's admissions during the administrative hearing regarding his abilities further impugn Dr. Robinson's forensic opinion. Hudson testified that he *can* lift and carry ten pounds. (T. 26, 48). Hudson also testified that he personally drove to physical therapy and other medical appointments. (T. 37). At home, Hudson testified that he read, watched television, and used a computer. (T. 47).

In sum, ALJ Shaw had ample reasons, carefully articulated in his decision, for affording little weight to Dr. Robinson's opinions regarding Hudson's physical

---

[23] Dr. Rivera opined that "most of the limitations to range in motion are voluntary on [Hudson's] part and are not secondary to severe trauma of the motor vehicle accident." (T. 368).

RFC. (T. 27-28). ALJ Shaw did not violate applicable law nor did he exceed his discretion, as courts within this circuit *uniformly* agree that treating source opinion can be rejected when – as here – there is good reason for doing so.[24] Finally, ALJ Shaw's articulated reasons are supported by substantial evidence.[25] Under these circumstances, there is no violation of the treating physician rule.

### 2.   Mental Capacity Assessment

ALJ Shaw gave little weight to social worker Larkin's opinions and assessment that Hudson has marked and extreme limitations in his ability to perform work-related mental activities. (T. 27-28). ALJ Shaw first observed that a social worker is not an "acceptable medical source" capable of establishing a medically-determinable impairment. (T. 28).[26] Opinions of "other medical sources," such as therapists and social workers, are not entitled to controlling weight, and an administrative judge has discretion to determine appropriate weight to accord such opinions. *Diaz v. Shalala*, 59 F.3d 307, 313-14 (2d Cir. 1995).

Here, ALJ Shaw explained that he assigned Ms. Larkin's opinions and assessment little weight because they were not adequately supported by clinical findings and other evidence. (T. 28). Further, while Ms. Larkin assessed that

---

[24]    *See* cases cited earlier in Section IV.*B*.1.*a*.

[25]    While ALJ Shaw could have discussed the factors listed in the regulations in more detail, this does not amount to reversible error because the rationale for his decision is clear and his ultimate determination is supported by substantial evidence. *See Petrie v. Astrue*, 412 Fed. App'x 401, 406-07 (2d Cir. 2011) (claimant's contention that ALJ failed to consider all relevant factors in giving treating physician's opinion minimal weight without merit because evidence of record permitted court "glean the rationale of [the] ALJ's decision" and "application of the correct legal standard could lead to only one conclusion") (internal citations omitted).

[26]    *See* 20 C.F.R. §§ 404.1513(d), 416.913(d).

Hudson had extreme limitations in social interaction, another social worker (*i.e.*, Debra Del Vecchio, LCSW, CASAC), in an alcoholism and substance abuse evaluation, reported that he had strong familial relationships and spent most of his time with family and friends. (T. 28, 384, 388, 428). Similarly, Ms. Larkin acknowledged that Hudson's condition improved with therapy such that his panic attacks decreased. (T. 424).

More significantly, Ms. Larkin's mental capacity assessment conflicted with that of Dr. Barry, the consultative psychologist who is an "acceptable medical source." Dr. Barry opined that Hudson can follow simple directions and instructions, and should be able to perform simple tasks independently. (T. 373). According to Dr. Barry, Hudson demonstrated ability to maintain attention and concentration, although he had difficulty handling stressors and making appropriate decisions. (T. 373). These opinions were based on many normal mental status findings.

Dr. Barry found that Hudson cooperated with the evaluation. (T. 371). She observed his overall manner of relating and social skills were fair. *Id*. He was appropriately dressed. *Id*. His personal hygiene and grooming were good. *Id*. His gait, posture, and motor behavior were normal. *Id*., at 372. His eye contact was appropriate, and his speech was fluent and clear. *Id*. His receptive and expressive language skills were adequate. *Id*. Dr. Barry reported that Hudson's thought processes were coherent and goal-directed with no evidence of delusions, hallucinations, or disordered thinking. *Id*. His affect was full range and appropriate to his speech and thought content. *Id*. His mood was full range and calm, and he did not appear overly anxious or depressed. *Id*. His sensorium was clear and he was oriented in all three spheres. *Id*. His attention and concentration were intact; he was able to do counting, simple calculations,

and serial 3s (counting backwards from 100 to 50 by 3s). *Id*. His recent and remote memory skills were intact. *Id*. His intellectual functioning was estimated to be in the low-average range. *Id*. His general fund of information was appropriate to experience. *Id*.

Finally, the Psychiatric Review Technique form dated February 11, 2011, submitted by State agency medical consultant, Dr. Reddy, (T. 407) confirms Dr. Barry's assessment. Although Dr. Reddy did not examine Hudson, Regulations require ALJ Shaw to consider Dr. Reddy's assessments, as such consultants are highly trained physicians who are experts in the evaluation of medical issues in disability claims. *See* 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(f)(2), 416.912(b) (6), 416.913(c), and 416.927(f)(2).

ALJ Shaw committed no legal error in rejecting the opinions of Hudson's treating social worker.

B.    *Hudson's Subjective Testimony*

Hudson testified that he experiences constant pain in his neck and stated that his symptoms are exacerbated by physical activity. He stated that he wakes up several times a night due to dreams of pain. In terms of cleaning, cooking and errands around the home, he asserted that his parents take care of everything. Hudson claimed that side effects of his medications include acid reflux and withdrawal symptoms such as stomach pain. Functionally, he testified that he could sit for up to 40 minutes, stand for 10 minutes and walk only one quarter of a city block. He stated that he could lift and carry 10 pounds. He claimed that he had not consumed alcohol in 6-7 months, but he had smoked marijuana twice in the last 2-3 months. (T. 25-26, 36-52).

After considering this testimony, ALJ Shaw concluded:

> After careful consideration of the evidence, the undersigned finds that . . .
> claimant's statements concerning the intensity, persistence and limiting
> effects of these symptoms are not credible to the extent they are
> inconsistent with the above residual functional capacity assessment.

(T. 26).

Correct legal principles governing credibility assessments of subjective, interested testimony were provided earlier in Section IV.*B*.1.*c*. ALJ Shaw's written decision reflects that he considered the objective factors identified in the governing Regulation to the extent there was evidence thereof. He engaged in the two-step process as required by the applicable Ruling. Finally, he provided explicit reasons for finding Hudson's subjective complaints not fully credible, as required by circuit law. (T. 25-27). Thus, there is no obvious structural legal error in ALJ Shaw's approach to assessing credibility of Hudson's subjective testimony.

ALJ Shaw's application of those principles was not patently unreasonable under the evidence. No objective medical evidence substantiates Hudson's subjective complaints. Hudson admitted at the evidentiary hearing that he can lift and carry ten pounds. (T. 26, 48). His daily activities and lifestyle belie his forensic testimony. Hudson drives himself to physical therapy and other medical appointments. (T. 37). At home, he reads, watches television, and uses a computer. (T. 47). Hudson spends most of his leisure time with friends (contradicting allegations regarding functional limitations related social

interaction).  (T. 388).  Finally, Hudson provided inconsistent accounts of marijuana use.[27] (51, 370).

ALJ Shaw applied correct principles of law in assessing Hudson's credibility, and his assessment of Hudson's diminished credibility is supported by substantial evidence.  "It is the function of the [Commissioner], not the [reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte*, 728 F.2d at 591 (second alteration in original) (internal quotation marks omitted).  Accordingly, where the ALJ's decision to discredit a claimant's subjective complaints is supported by substantial evidence, the Court must defer to his findings.  *See id.*

C.   *Does Substantial Evidence Support RFC Assessment?*

In conclusory fashion, Hudson argues that ALJ Shaw's residual functional capacity assessment is not supported by substantial evidence.  The basis for this argument is obscure, but a meaningful clue stems from Hudson's assertion that ALJ Shaw placed "unreasonable weight" on the physical and mental capacity assessments of consultative examiners and the confirming assessment of the State agency medical consultant.  (Dkt. No. 13, p. 9).

As such, this point is but the flip side of unsuccessful arguments previously addressed.  Taken to its logical conclusion, the argument's premise is that ALJ Shaw was bound to accept treating source opinion and Hudson's subjective testimony.  That evidence would not support a finding of RFC for light

---

[27]    Dr. Barry noted in January 2010 that Hudson claimed that he had not used marijuana or alcohol since December 2009.  (T. 370).  Hudson testified at the administrative hearing in April 2011 that he had continued to drink alcohol until six or seven months prior to the hearing, and that he had used marijuana as recently as three months before the hearing.  (T. 51).

work with limitations. Hence ALJ Shaw's RFC assessment lacks substantial evidentiary support.

This argument is fatally flawed because its premise is unsound. Preceding sections demonstrate that ALJ Shaw was not bound to accept treating source opinion or Hudson's testimony, and that he committed no error in rejecting both due to lack of credibility. ALJ Shaw acted within his discretion, therefore, when subsequently basing his residual functional capacity assessment on other evidence in the record, *viz.*, objective medical evidence and consultative opinions.

Consultative and reviewing examinations, like that of Drs. Rivera, Barry and Reddy, can constitute substantial evidence in support of an ALJ's decision. *See Mongeur*, 722 F.2d at 1039; *see also Halloran*, 362 F.2d at 32. Not only may reports of consultative and/or non-examining physicians be substantial evidence, they may override opinions of treating physicians, provided they are supported by evidence in the record. *See Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993); *accord Netter v. Astrue*, 272 Fed. App'x 54, 55-56 (2d Cir. 2008); *see also Leach ex. Rel. Murray v. Barnhart*, No. 02 Civ. 3561, 2004 WL 99935, at 9 (S.D.N.Y. Jan. 22, 2004) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole."). To the extent Hudson argues otherwise (Dkt. No. 13), such contention is without merit.

ALJ Shaw's RFC assessment clearly is consistent with the objective medical evidence and the expert opinions of the consultative examiners and consultative reviewer of Hudson's medical records. Having properly rejected or discounted Hudson's subjective testimony and the opinions of treating sources, the remaining objective evidence and consultants' opinions amount to relevant

evidence that a reasonable mind might accept as adequate to support a conclusion. Under that circumstance, there is no basis to conclude that ALJ Shaw's RFC assessment is not supported by substantial evidence.

D. *Reliance Upon Vocational Expert Testimony*

When considering whether Hudson can still perform alternative, available work, ALJ Shaw asked VE Pearsall to assume that a hypothetical individual of Hudson's age, education and work history could perform work activities at the light exertional level with several limitations and exceptions. (T. 55). Those exceptions were that the individual: (a) could perform light work, but lift and carry no more than 10 pounds occasionally; (b) must work in a low stress environment (defined as less than a production line pace with only limited decision making), and have only limited contact with the public and supervisors; (c) ability to look up and down or right and left as needed; (d) must avoid hazardous conditions and extreme temperatures, and (e) has the ability to sit or stand at will. *Id.* Dr. Pearsall testified that such an individual can perform sedentary, unskilled jobs of weight tester, surveillance system monitor, and quotations clerk. (T. 56). He further testified that jobs in each position exist in significant numbers in the national economy. *Id.*

Hudson argues that the ALJ's reliance on Dr. Pearsall's opinion was improper because the hypothetical question only included physical limitations. (Dkt. No. 13, p. 10). Hudson is mistaken. ALJ Shaw's question expressly included the limitation that the hypothetical individual would require a *low stress environment*, with only *limited decision making*, and *limited contact with the public and supervisors*. (T. 55). These limitations, derived from the SSA consultative examiner's and reviewer's findings, "capture[d] the concrete consequences" of Hudson's mental impairments. *See Calabrese v. Astrue*, 358

Fed. App'x 274, 277 (2d Cir. 2009). Hence, Hudson's challenge to the adequacy of the factual premises in ALJ Shaw's hypothetical question must fail.

"The Commissioner may rely on a vocational expert's testimony concerning the availability of jobs suited to a hypothetical person's capabilities so long as the hypothetical is based on substantial evidence." *See Mancuso v. Astrue,* 361 Fed. App'x 176, 179 (2d Cir. 2010) (citing *Dumas v. Schweiker*, 712 F.2d 1545, 1553–54 (2d Cir. 1983)); *see also Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) (finding that it is standard practice for the Commissioner to use vocational expert testimony to satisfy his burden of showing that there exist jobs that the claimant is capable of performing, and that an ALJ may rely on the testimony of such an expert, including responses to hypotheticals). ALJ Shaw's RFC assessment, therefore, is supported by substantial evidence.

## VII.  Recommendation

The Commissioner's decision denying disability-based benefits reflects application of proper legal standards, and it is supported by substantial evidence. Therefore, it should be **AFFIRMED**.

## VIII.  Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir.

1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the ___21___ day of _____March_____ 2013.

Earl S. Hines
United States Magistrate Judge